## THE TORNADO.

### GOOD INTENT TOW–BOAT COMPANY & Others *v.* ATLANTIC MUTUAL INSURANCE COMPANY & Others.

### ATLANTIC MUTUAL INSURANCE COMPANY & Others *v.* GOOD INTENT TOW–BOAT COMPANY & Others.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF LOUISIANA.

Argued October 22d, 1883.—Decided November 5th, 1883.

*Appeal—Contract—Insurance—Salvage.*

The owners of three steam-tugs which had pumping machinery were employed by the master and agent of a ship sunk at a wharf in New Orleans, with a cargo on board, to pump out the ship for a compensation of $50 per hour for each boat, " to be continued until the boats were discharged." When the boats were about to begin pumping, the United States marshal seized the ship and cargo on a warrant on a libel for salvage. After the seizure the marshal took possession of the ship and displaced the authority of the master, but permitted the tugs to pump out the ship. After they had pumped for about eighteen hours, the ship was raised and placed in a position of safety. The tugs remained by the ship, ready to assist her in case of need, for twelve days, but their attendance was unnecessary, and not required by any peril of ship or cargo. In libels of intervention, in the suit for salvage, the owners of the tugs claimed each $50 per hour for the whole time, including the twelve days, as salvage. The claims were resisted by insurers of the cargo, to whom it was abandoned. The District Court allowed $500 to each tug, and $500 to the crew of each tug. On appeal by the owners of the tugs, the Circuit Court decreed to each of them $1,000. On further appeal by them, this court affirmed that decree.

*Held,* That to enforce the contract as one continuing during the time claimed would be highly inequitable ; and, as against the insurers of the cargo, the right of the tugs to compensation must be regarded as having terminated when the ship and cargo were raised, and the tugs must be regarded as having been then discharged.

The decree of the Circuit Court was entered May 24th, 1880. June 26th a cross appeal to this court, returnable at its October term following, was allowed. The bond thereon was filed in the Circuit Court July 5th. But the appellants in it did not docket it, or enter their appearance on it, in this court, until September 27th, 1883 : *Held,* That it must be dismissed.

These were three libels of intervention filed in the District Court of the United States for the District of Louisiana, against the ship Tornado, her cargo and freight, and the proceeds thereof in the registry of that court, to recover for salvage services rendered by three steam-tugs, the Rio Grande, the Norman and the Harry Wright.

The libel in the case of the Rio Grande alleged an employment of her owners on the 27th of February, 1878, by the masters and agents of the Tornado, "to pump out and raise said ship and her cargo," with the pumps and appliances of the Rio Grande, for a compensation of $50 per hour, and claimed $14,900, for 298 hours, from 6 o'clock P.M. on February 27th, till 4 o'clock A.M. on March 12th. It alleged that the marshal of the United States seized the ship while the work was going on, and directed the libellants to proceed under the contract to finish the work.

The libel in the case of the Norman alleged an employment of her owners on the 27th of February, by the master and agents of the Tornado, "to assist in pumping out and raising said ship and cargo," by the use of the Norman and her appliances, for a compensation of $50 per hour, and claimed $13,900, for 278 hours, from 6 o'clock P.M. on February 27th, till 8 o'clock A.M. on March 11th. The libel alleged that the ship was under seizure by the marshal when the work was commenced, and that the marshal continued the services of the Norman till the saving of the ship and cargo was fully assured.

The libel in the case of the Rio Grande alleged an employment of her owners, on February 27th, to pump water out of the ship, and to remain near her afterwards ready to render service, for a compensation of $50 per hour, and claimed $11,200, for 224 hours, from 10 o'clock P.M. on February 27th, till 6 o'clock A.M. on March 9th. The libel alleged that the ship was raised and saved, with her cargo, late in the afternoon of February 28th; and that the marshal, after he seized the ship and cargo, continued the employment of the tug under said contract.

The resistance to these claims was made by the underwriters on the cargo, to whom the cargo was abandoned. Their answer alleged that the ship and cargo and her freight were

seized by the marshal about midday of February 27th; that the three tugs came about sundown on the 27th, but performed no effective service in pumping during that night; that effective pumping began the next morning; and that by noon on the 28th the ship was raised out of water, and was free from all danger of sinking or again taking in water.

The district court awarded $1,000 to each tug, one-half to her owners and the other half to her crew. The owners of the three tugs appealed to the circuit court, and that court awarded to the owners of each tug $1,000, and they appealed to this court. The circuit court found the facts and the conclusions of law on which it rendered its decree. There was no bill of exceptions, and the review of the decree is limited to a determination of the questions of law arising on the record. The material findings of fact by the circuit court were as follows:

"The ship Tornado was a vessel of 1,720 tons burden, and had come to the port of New Orleans for a cargo of cotton, which she had shipped and stowed away, to the amount of 5,195 bales. She was almost ready for sea, and was lying alongside the wharf in the Third District of the city of New Orleans, at the foot of Marigny street, when, on Sunday, the 24th of February, 1878, at six o'clock A.M., smoke was found coming out of the main hatch, and a number of the crew were at once sent to the nearest fire-alarm box, and the fire department of the city of New Orleans were quickly on the spot. The main hatch having been opened, the fire-engines immediately commenced to throw water down the main hatch, which they continued to do until nine o'clock A.M., when the main hatch was closed, and the steam gas-boat Protector, being provided with apparatus for the manufacture of carbonic acid gas, commenced to attempt to extinguish the fire, which at that time was raging quite violently in the hold, by attempting to fill the vessel with carbonic acid gas. This continued until nine o'clock P.M., when the main hatch was opened, and it was found that there was less smoke than there had been before the experiment with the gas had commenced. The engineer of the Protector went down the main hatch, and having hooked on to some bales of the cotton they were hoisted up

### Statement of Facts.

and landed on the levee greatly charred. In the meantime the fire-engines were pumping in water through the hatch hole, and the smoke was increasing. A hole was then cut in the deck abreast the main rigging on the starboard side, and some fourteen bales of cotton were got out of this hole. At six o'clock P.M. smoke was greatly increasing and the hatches were again put on, and the hole in the deck covered, and the Protector again commenced pouring carbonic acid gas into the hold of the vessel, and continued doing so during the night. While these things were going on, the harbor tug-boats, the Continental, the N. M. Jones, the Belle Darlington, the Fern, the Aspinwall, the Charlie Wood, the Ida, the Ella Wood No. 2, the Joseph Cooper, Jr., and the Wasp, had all got there, hearing that the vessel was in peril, and were, with the fire department, engaged in pouring water, with their more or less powerful pumps, upon the fire, at all times when the gas experiments were not going on. Arriving at the scene of the disaster, some earlier than others, they were all there during the whole of the first day. On Monday the 25th of February, at six o'clock in the morning, the main hatch was opened, and the hole that had been made in the deck was uncovered, and the smoke was found to be greatly increased ; some thirty-two bales of cotton were at this time taken out by the stevedores. The fire department was hard at work pumping water, and several holes were cut in the decks, trying to get at the seat of the fire. The main pumps were taken up to allow the hose suction to be put down, and the Protector and the steam engines were pumping out the water part of the day, but the smoke kept on increasing. At six o'clock P.M. there were twelve feet six inches of water in the hold, and the draft of water aft was twenty-three feet eight inches, and forward twenty-five feet six inches. At eleven and a half P.M. the smoke was still increasing and appearing, and the crew were employed in landing the sails and new ropes, sizing stuff, and all that could be got at, on the wharf. On Tuesday, the 26th of February, at six o'clock A.M., Canby, the regular stevedore of the vessel, and his men, came on board and landed the boats and water casks on the wharf, tore up the forward deck and carlings and commenced to save cargo. By noon the stevedore Drysdale had 181 bales landed, and Mr. Canby 100. The fire department were pouring in water during the night and all the forenoon, and

still the smoke increased, and by noon the men were forced to come up from the hold, and the fire brigade were set to work to fill the ship with water, it having been determined by the captain that the only chance of saving any part of the ship or cargo was to fill her with water and sink her, it being deemed impossible to stop the fire otherwise ; and about seven o'clock P.M. of Tuesday, February 26th, the ship sank, the water being two or three feet above the main deck.   On Wednesday, February 27th, Ellis, the master, and Shultz, the agent of the Tornado, made a contract with the tow-boat association to which the Norman, Rio Grande, and Harry Wright belonged, to pump out the Tornado for a compensation of fifty dollars per hour for each boat, to be continued until the boats were discharged.   After the making of said contract, and while the Tornado still lay upon the bottom of the river, the Protector filed a libel for salvage against the Tornado and cargo, and, by virtue of a warrant issued on said libel, the United States marshal seized the Tornado and cargo when the said tow-boats were about to begin pumping her out.   After the seizure the marshal took possession of the Tornado and displaced the authority of the master, but permitted the said tow-boats to proceed and pump out the Tornado.   The said tow-boats commenced pumping out the Tornado early in the evening of February 27th, assisted by other tugs and the fire department of the city of New Orleans, and succeeded, with said assistance, at twelve o'clock M. of Thursday, February 28th, in raising the Tornado and placing her in a position of safety.   The efficient work of pumping out the Tornado was done between 6 A.M. and 12 M. of February 28th.   The said pumping service was done without serious danger to the tow-boats by which it was rendered.   The total valuation of the property saved was $140,090.75.   The value of the tow-boats in the aggregate was $75,000 ; and their daily expenses were each $100, when actually at work.   The usual charge made by tugs in the port of New Orleans is from $6 to $12 per hour for pumping.   The said tow-boats remained alongside the Tornado after she was raised, ready to render her assistance in case it was needed, for the period of about twelve days, but such attendance was unnecessary and not required by any peril of the Tornado and cargo, and the fire department of the city was also at hand ready to extinguish a fire in the Tornado should

it again break out. The three tow-boats of the appellants, at the time of making the contract, were out of service, laid up on the other side of the river, without crews or provisions, but were immediately manned and victualled and brought over and laid alongside of the Tornado in the afternoon of Wednesday, the 27th of February. At that time there were no other tow-boats alongside of the Tornado. The said tow-boats were provided with machinery and pumps for extinguishing fires and pumping out sunken ships."

The circuit court found the following conclusions of law from these facts: 1. The contract made by the master and agent of the Tornado for pumping her out was inequitable, and ought not, under the facts of the case, to be enforced. 2. The service rendered by the three tow-boats was a salvage service, but one of low grade. 3. Each of them should be allowed $1,000. 4. The costs of the appeal should be paid out of the fund in the registry. The decree was that the owners of each tug recover $1,000 from the fund in the registry, and that the costs of the appeal be paid out of that fund.

*W. J. P. Hornor* and *Mr. Wm. S. Benedict* for the Tow. Boat Company, and *Mr. P. Phillips*, *Mr. James McConnell* and *Mr. Hallett Phillips* for the Insurance Companies.

MR. JUSTICE BLATCHFORD delivered the opinion of the court. After stating the facts as above set forth, he continued:

The sole question to be considered on the appeal of the appellants is, whether the amounts which the circuit court awarded to them severally, as owners of the three steam-tugs, should be increased. The errors assigned by the appellants are (1) that the circuit court held that the contract for pumping out the ship was inequitable, and ought not, under the facts of the case, to be enforced; (2) that it held that the salvage service was of a low grade; (3) that it allowed to each boat only $1,000. These are all assigned as errors in conclusions of law. There is no complaint made by the libellants of the conclusion of law that the service was a salvage service.

In the case of *The Connemara*, 108 U. S., this court said:

"The services performed being salvage services, the amount of salvage to be awarded, although stated by the circuit court in the form of a conclusion of law, is largely a matter of fact and discretion, which cannot be reduced to precise rules, but depends upon a consideration of all the circumstances of each case."

We are of opinion that no ground is shown, on the facts found, for awarding a larger sum to the appellants than the circuit court allowed them. The contract, as found, was a contract made by the master and the agent of the ship with the association to which the three tugs belonged, "to pump out" the ship, for a compensation of $50 per hour for each boat, "to be continued until the boats were discharged." This does not give a very clear idea as to what the contract was. If the pumping out should be completed, there could be no continuance of the service of pumping out the ship, or of the contract to pump out the ship. If the contract was, that the compensation named should continue, in any event, and whether the ship was pumped out or not, until the boat should be discharged, the attendance of the boats alongside of the ship, after she was pumped out and raised and placed in a position of safety, the boats being ready to render assistance, in case it was needed, for a period of about twelve days, is found to have been unnecessary and not required by any peril of the Tornado and cargo. It is not found, as a fact, that the boats were formally discharged by the master or agent of the ship. But it is found that after the contract was made, and while the ship still lay at the bottom of the river, and when the boats were about to begin to pump her out, the marshal seized the ship and cargo under a warrant on a libel for salvage filed against the ship and cargo, and took possession of the ship, and displaced the authority of the master, but permitted the boats to proceed and pump out the ship, and that they, with other assistance, pumped out the ship and raised her and placed her in a position of safety by a pumping service of about eighteen hours. It is not found that the marshal requested or sanctioned in any way the continued presence of the tugs after the ship was raised and made safe. The authority of the master was displaced by the marshal. On these facts we are of opinion that

to enforce the contract as one continuing during the time claimed by the libellants would be highly inequitable; and that, as against the insurers of the cargo, the right of the boats to compensation must be regarded as having terminated when the ship and cargo were raised, and the boats must be regarded as having been then discharged, within any fair interpretation which can be given to the contract. A compensation of $50 per hour for the eighteen hours of actual pumping would amount to $900. Every agreement for salvage compensation is subject, as to amount, to the judgment of the court as to its being equitable and conformable to the merits of the case. Parsons on Shipping, 306; *The Helen and George,* Swabey, 368; Jones on Salvage, 94 *et seq.*

The final decree of the circuit court was entered on the 24th of May, 1880. On the 26th of June following, the underwriters on the cargo filed a petition in the circuit court praying a cross-appeal to this court from the decree, and it was allowed, returnable at the October term, 1880. On the 5th of July following, the bond on the cross-appeal was filed in the circuit court. But the appellants in the cross-appeal did not docket it or enter their appearance on it, in this court, until September 27th, 1883; and the appellees in it are entitled to have it dismissed. *Grigsby* v. *Purcell,* 99 U. S. 505; *The S. S. Osborne,* 105 U. S. 447.

*The cross-appeal is dismissed, and on the appeal of the libellants, the decree of the circuit court is affirmed.*